IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND

DERRICK TOOMER,                    *
          Plaintiff,
      v.                     *    CIVIL ACTION NO. DKC-13-0614

WARDEN, et al.,               *
          Defendants.
                    ***

**MEMORANDUM OPINION**

Pending is a Motion to Dismiss, or in the Alternative Motion for Summary Judgment filed by Defendant Corizon Medical Services/Correctional Medical Services ("CMS"). ECF No. 66.[1] Plaintiff has responded.[2] ECF No. 77. Upon review of papers and exhibits filed, the court finds an oral hearing in this matter unnecessary. *See* Local Rule 105.6 (D. Md. 2014). For the reasons stated below, the dispositive motion will be granted.

**Background**

The case was instituted upon receipt of correspondence from Plaintiff Derrick Toomer, then a pretrial detainee held at the North Branch Correctional Institution ("NBCI"). Plaintiff complained that as a pretrial detainee he had no access to administrative remedies and further

---

[1] Defendant's Motion to Seal Plaintiff' Medical Records (ECF No. 67), which is unopposed, shall be denied. Plaintiff's medical records are already a part of the public docket (ECF Nos. 41 and 51) and Defendant offers no explanation as to why the records require sealing or are impractical to redact. *See generally Doe v. Public Citizen*, 749 F.3d 246 (4th Cir. 2014).

[2] Plaintiff has also filed a Motion to Amend seeking to add claims of breach of contract and criminal negligence to his civil rights complaint. ECF No. 74. The Motion will be denied. As Plaintiff's federal claim is subject to dismissal, the court would decline to exercise jurisdiction over his pendant state court claims. Therefore any amendment to his Complaint to assert these claims would be futile. *See* 28 U.S.C. §1367(c)(3); *United Mine Workers v. Gibbs,* 383 U.S. 715, 726 (1966).

Plaintiff has also filed a Motion for Court Order (ECF No. 75) wherein he reasserts his claims against Wexford and CMS for failure to provide adequate medical care. The Motion will be denied. Plaintiff's Complaint against Wexford was previously dismissed (ECF Nos. 51 & 52), the court having found that at the onset of Plaintiff's injuries Wexford was solely responsible for utilization review and approving of off-site/ancillary medical services. The court found "Plaintiff's claims focus on the delivery of primary health care after his off-site surgical procedure: the failure to return him for follow-up care after the surgery, the delay in requesting physical therapy, and the failure to advise him on the proper use of his cast/splint. These claims are properly asserted against the direct health care provider during the time at issue, namely CMS and its employees." ECF No. 51, p. 11. CMS was directed to respond to the complaint which they have done. ECF No. 66.

alleged that he had been denied medical care while housed at the Baltimore County Detention Center.   ECF No. 1.   Thereafter, Plaintiff filed a court-directed amended Complaint naming Sharon Baucom, the Department of Public Safety and Correctional Services ("DPSCS"), M. Stouffer, and "Wexford Medical Health Care Provider" as Defendants.  ECF No. 7.  Plaintiff was permitted to amend the Complaint again to add Corizon Medical Services/Correctional Medical Services ("CMS") as an additional Defendant.  ECF No. 52.   Plaintiff's Complaint against all Defendants, except CMS, was previously dismissed. ECF Nos. 51 & 52.

As previously stated by the court, Plaintiff alleged that the named Defendants refused him medical care for injuries he sustained after he was stabbed in the hand in April of 2010.  ECF No. 51.   Plaintiff states that after undergoing surgery he was provided a half-cast/half-splint to immobilize his hand and given discharge instructions directing he return for follow up in 7-10 days.  Plaintiff states that he wore the splint for three months rather than for the 7-10 days as directed.  He indicates he was not provided rehabilitation for his hand and forearm for 20 months, resulting in his arm "heal[ing]wrong" and necessitating the daily use of Neurontin due to nerve damage and pain.  Plaintiff also claims that he has lost strength in two of his fingers and suffers from nightmares when his arm hurts because "it feels like I'm right back to BCDC fighting for my life." *Id*.

CMS was responsible for providing medical care to Defendant from the date of the stabbing until the end of June, 2012, when its contract with DPSCS expired and Wexford took over on-site medical care for state detainees and inmates.  ECF No. 66, p. 2.  As previously found by the court, Plaintiff was provided the following medical care during the time CMS was the independent medical contractor for the DOC:

> Plaintiff's uncontroverted medical records demonstrate that on April 30, 2010, he was transported to Union Memorial Hospital for evaluation and treatment

of a stab wound to his right forearm.  ECF No. 41, Ex. 2, p. 490-94.  At the time of Plaintiff's injury, surgery and immediate post-surgical care, Defendant Wexford solely provided onsite utilization review management services for off-site medical services, hospitalizations, and other specialized medical or clinical services provided to inmates in the custody of the DPSCS.   ECF No. 41 and Affidavit. Wexford continued its role of utilization review but also undertook responsibility for primary patient care of inmates in the custody of DPSCS on July 1, 2012. *Id.*

Plaintiff underwent surgery to repair the laceration and tendon injury to the forearm.  No pre-authorization of the surgery was required by Wexford due to the emergent nature of the injury.  Thereafter, on October 30, 2011, Wexford received a request from Colin Ottey, M.D. for a physical therapy consultation after Plaintiff complained of decreased sensation and difficulty holding objects due to weakness in the 4th and 5th digits of his hand.  *Id.,* Ex. 1 & 2, p. 18-19, 24-25, 29-30.  Dr. Ottey associated the complaints with neuropathy arising from Plaintiff's stab injury.  The request for physical therapy was approved by Wexford on November 1, 2011.  *Id.*, Ex. A.   Plaintiff received physical therapy to his right hand on November 29 and December 6, 8, 13, 15, 22, and 27, 2011.  *Id*., Ex. 2 p. 32-33, 37-45.

On December 29, 2011, Wexford received a request for additional physical therapy sessions.  The request was approved the same day and Plaintiff was provided additional physical therapy throughout January. *Id.*, Ex. 2, pp. 46-51.  On January 24, 2012, Plaintiff's physical therapist noted Plaintiff reported improvement in the functional use of his hand.  Examination revealed functional grip strength and full range of motion within normal limits in his 4th and 5th fingers.  Additionally, it was noted that Plaintiff demonstrated a positive tinel sign (a tingling sensation felt in the distal portion of a limb upon percussion of the skin over a regenerating nerve in the limb) over his surgical incision which was noted to be related to neuropathy.  The therapist indicated Plaintiff had reached optimum benefit from physical therapy and Plaintiff was discharged.  *Id*.

Plaintiff was seen by the physical therapist for recertification on March 13, 2012.  At that time he indicated he continued to have problems with his right forearm.   The physical therapist noted Plaintiff's complaints were related to neuropathy of the right forearm and recommended an additional physical therapy session.  There is no record, however, that a request for physical therapy was presented to Wexford for review.  *Id*., Ex. 1, Ex. 2 p. 53-54.

On April 4, 2012, Plaintiff was seen by Dr. Ottey in the chronic care clinic for his diabetes.  Dr. Ottey issued no consult request for further physical therapy. *Id.*, Ex. 2. p. 56-58.

Physician's Assistant Katie Winner examined Plaintiff on April 25, 2012. Plaintiff complained of arm pain for a year at a 9 out of 10 on the pain scale and requested an increase in his dose of Neurontin.  Winner noted Plaintiff's right

forearm was tender to palpation with decreased range of motion in the 4th and 5th digits and his grip strength was 4/5. Winner ordered application of cold and warm compresses and ice as needed to his arm. She also ordered front handcuffing and noted that the pharmacist would be consulted regarding Plaintiff's pain management. No consult for further physical therapy was generated by Winner. *Id.*, p. 61-62.

Plaintiff was seen by Dr. Ottey on May 12, 2012, and complained of an increase in pain in the arm and hand. *Id.*, p. 64-65. Ottey noted tenderness in the right forearm as well as Plaintiff's history of nerve injury. He ordered an increase in Plaintiff's Neurontin dose and recommended no weights or heavy lifting and for Plaintiff to return for follow up if there was no improvement in thirty days. *Id.*, p. 64-65.

On July 1, 2012, Wexford became the medical contractor for DPSCS assuming the contract for the delivery of primary medical care and continuing its role as utilization review manager. *Id.*, Ex. 1. At that time Plaintiff was receiving Neurontin, Naproxen and Triamcinolone Acetonide for his right arm. *Id.*, p. 82.

ECF No. 51, p. 3-5.

**Standard of Review**

A.      Motion to Dismiss

The purpose of a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6) is to test the sufficiency of the  plaintiff's complaint. *See Edwards v. City of Goldsboro,* 178 F.3d 231, 243 (4th  Cir. 1999). The dismissal for failure to state a claim upon which relief may be granted does not require defendant to establish "beyond doubt" that plaintiff can prove no set of facts in support of his claim which would entitle him to relief. *See Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 561 (2007). Once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint. *Id.* at 563. The court need not, however, accept unsupported legal allegations, *see Revene v. Charles County Comm'rs,* 882 F.2d 870, 873 (4th Cir. 1989), legal conclusions couched as factual allegations, *see Papasan v. Allain,*

478 U.S. 265, 286 (1986), or conclusory factual allegations devoid of any reference to actual

events, *see United Black Firefighters v. Hirst*, 604 F.2d 844, 847 (4th Cir. 1979).

B.      Motion for Summary Judgment

Summary Judgment is governed by Fed. R. Civ. P. 56(a) which provides that:

> The court shall grant summary judgment if the movant shows that
> there is no genuine dispute as to any material fact and the movant is
> entitled to judgment as a matter of law.

The Supreme Court has clarified that this does not mean that any factual dispute will

defeat the motion:

> By its very terms, this standard provides that the mere existence of
> *some* alleged factual dispute between the parties will not defeat an
> otherwise properly supported motion for summary judgment; the
> requirement is that there be no *genuine* issue of *material* fact.

*Anderson v. Liberty Lobby, Inc*., 477 U. S. 242, 247-48 (1986) (emphasis in original).

"The party opposing a properly supported motion for summary judgment 'may not rest

upon the mere allegations or denials of [his] pleadings,' but rather must 'set forth specific facts

showing that there is a genuine issue for trial.'" *Bouchat v. Baltimore Ravens Football Club, Inc*.,

346 F.3d 514, 525 (4th Cir. 2003) (alteration in original) (quoting Fed. R. Civ. P. 56(e)).  The

court should "view the evidence in the light most favorable to . . . the nonmovant, and draw all

inferences in her favor without weighing the evidence or assessing the witness' credibility."

*Dennis v. Columbia Colleton Med. Ctr., Inc*., 290 F.3d 639, 644-45 (4th Cir. 2002).  The court

must, however, also abide by the "affirmative obligation of the trial judge to prevent factually

unsupported claims and defenses from proceeding to trial."  *Bouchat*, 346 F.3d at 526 (internal

quotation marks omitted) (quoting *Drewitt v. Pratt*, 999 F.2d 774, 778-79 (4th Cir. 1993), and

citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986)).

In *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249 (1986) the Supreme Court explained that in considering a motion for summary judgment, the "judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." A dispute about a material fact is genuine "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*. at 248. Thus, "the judge must ask himself not whether he thinks the evidence unmistakably favors one side or the other but whether a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Id*. at 252.

The moving party bears the burden of showing that there is no genuine issue as to any material fact. No genuine issue of material fact exists if the nonmoving party fails to make a sufficient showing on an essential element of his or her case as to which he or she would have the burden of proof. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Therefore, on those issues on which the nonmoving party has the burden of proof, it is his or her responsibility to confront the summary judgment motion with an affidavit or other similar evidence showing that there is a genuine issue for trial.

## Analysis

A.    Supervisory Liability

The law in the Fourth Circuit is well established that the doctrine of *respondeat superior* does not apply in § 1983 claims. *See Love-Lane v. Martin*, 355 F. 3d 766, 782 (4th Cir. 2004) (no respondeat superior liability under §1983). Liability of supervisory officials "is not based on ordinary principles of *respondeat superior*, but rather is premised on 'a recognition that supervisory indifference or tacit authorization of subordinates' misconduct may be a causative factor in the constitutional injuries they inflict on those committed to their care.'" *Baynard v.*

*Malone*, 268 F. 3d 228, 235 (4th Cir. 2001) citing *Slakan v. Porter*, 737 F. 2d 368, 372 (4th Cir. 1984).   Supervisory liability under § 1983 must be supported with evidence that:   (1) the supervisor had actual or constructive knowledge that his subordinate was engaged in conduct that posed a pervasive and unreasonable risk of constitutional injury to citizens like the plaintiff; (2) the supervisor's response to the knowledge was so inadequate as to show deliberate indifference to or tacit authorization of the alleged offensive practices; and (3) there was an affirmative causal link between the supervisor's inaction and the particular constitutional injury suffered by the plaintiff. *See Shaw v. Stroud*, 13 F. 3d 791, 799 (4th Cir. 1994).

Plaintiff's claims focus on the delivery of primary health care after his off-site surgical procedure:   the failure to return him for follow-up care after the surgery, the delay in requesting physical therapy, and the failure to advise him on the proper use of his cast/splint.   These claims as asserted against CMS fail.   Plaintiff has pointed to no action or inaction on the part of CMS that resulted in a constitutional injury, and accordingly, his claims against CMS shall be dismissed.

B.      Medical Claim

Even if Plaintiff had named the proper individual health care providers, they would be entitled to summary judgment.   The constitutional protections afforded a pre-trial detainee as provided by the Fourteenth Amendment are co-extensive with those provided by the Eighth Amendment. *See Bell v. Wolfish*, 441 U.S. 520, 535 (1979).   "Due process rights of a pretrial detainee are at least as great as the eighth amendment protections available to the convicted prisoner." *Hill v. Nicodemus*, 979 F.2d 987, 991 (4th Cir. 1992), citing *Martin v. Gentile*, 849 F. 2d 863, 870 (4th Cir. 1988).

The Eighth Amendment prohibits "unnecessary and wanton infliction of pain" by virtue of its guarantee against cruel and unusual punishment. *Gregg v. Georgia*, 428 U.S. 153, 173 (1976). "Scrutiny under the Eighth Amendment is not limited to those punishments authorized by statute and imposed by a criminal judgment." *De'Lonta v. Angelone*, 330 F. 3d 630, 633 (4th Cir. 2003) citing *Wilson v. Seiter*, 501 U.S.294, 297 (1991). In order to state an Eighth Amendment claim for denial of medical care, a plaintiff must demonstrate that the actions of the defendants or their failure to act amounted to deliberate indifference to a serious medical need. *See Estelle v. Gamble*, 429 U.S. 97, 106 (1976). Deliberate indifference to a serious medical need requires proof that, objectively, the prisoner plaintiff was suffering from a serious medical need and that, subjectively, the prison staff were aware of the need for medical attention but failed to either provide it or ensure the needed care was available. *See Farmer v. Brennan*, 511 U.S. 825, 837 (1994).

As noted above, objectively, the medical condition at issue must be serious. *See Hudson v. McMillian,* 503 U.S. 1, 9 (1992) (there is no expectation that prisoners will be provided with unqualified access to health care). Proof of an objectively serious medical condition, however, does not end the inquiry. The subjective component requires "subjective recklessness" in the face of the serious medical condition. *Farmer*, 511 U.S. at 839– 40. "True subjective recklessness requires knowledge both of the general risk, and also that the conduct is inappropriate in light of that risk." *Rich v. Bruce*, 129 F. 3d 336, 340 n. 2 (4th Cir. 1997). "Actual knowledge or awareness on the part of the alleged inflicter . . . becomes essential to proof of deliberate indifference 'because prison officials who lacked knowledge of a risk cannot be said to have inflicted punishment.'" *Brice v. Virginia Beach Correctional Center*, 58 F. 3d 101, 105 (4th Cir. 1995), *quoting Farmer,* 511 U.S. at 844. If the requisite subjective knowledge is established, an

official may avoid liability "if [he] responded reasonably to the risk, even if the harm was not ultimately averted." *Farmer*, 511 U.S. at 844.   Reasonableness of the actions taken must be judged in light of the risk the defendant actually knew at the time.  *Brown* 240 F. 3d at 390; citing *Liebe v. Norton*, 157 F. 3d 574, 577 (8th Cir. 1998) (focus must be on precautions actually taken in light of suicide risk, not those that could have been taken).

"[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference."  *Johnson v. Quinones* 145 F. 3d 164, 166 (4th Cir. 1998).  Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present.  *Id*. at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge).  Mere disagreement with a prescribed course of treatment is insufficient to establish an Eighth Amendment claim of deliberate indifference.  *See Russell v. Sheffer*, 528 F. 2d 318, 319 (4th Cir. 1975).

The record evidence demonstrates that Plaintiff was assessed following the April 30, 2010 altercation.  ECF No. 66, Ex. A, p. 12.  Plaintiff was treated at the detention center and efforts made to control the bleeding during his prompt transport to the emergency room.  *Id*., p. 14. Plaintiff received treatment at Union Memorial Hospital and returned to BCDC on May 2, 2010, where he was assessed and admitted to the infirmary.[3]  *Id*., p. 16.  During his stay in the infirmary, Plaintiff was provided medication for pain management, his dressings, which included an ace bandage with a soft cast, were changed three times daily and he was monitored by medical

---

[3] During Plaintiff's hospital stay he was diagnosed with diabetes.  Upon discharge it was noted that "Dr. Cheikh recommended the patient follow up at the diabetes clinic.  While in the hospital, he was also followed by hand surgery who felt he could be discharged from their standpoint."  ECF No. 41, Ex. 2, p. 492.  He was directed to follow up with diabetes clinic on a particular date and with the hand clinic in 7-10 days.  *Id*., p. 493.  It does not appear that he was returned to the either hospital clinic for follow-up but as noted below received all further care through the on –site medical providers.

personnel around the clock.[4]  *Id*. pp. 17-57, 63.  At Plaintiff's request the stitches on the right side of his face were removed on May 7, 2010.  *Id*., p. 41.

On May 10, 2010, Plaintiff was discharged from the infirmary for a court appearance (*Id*., p. 57-59) and later the same day assessed at BCDC after the court appearance where he refused assessment of his right arm stab wound.  *Id.,* p. 60.  The following day he was examined by Ana Pasatiempo, M.D. who noted that his post surgery wound was healing.  There was no evidence of infection, the dressing was changed and Plaintiff was provided pain medication.  Dr. Pasatiempo noted that she would let Dr. Saleem assess on Thursday and that the wound "would need suture removal."  *Id*., p. 62.

Plaintiff was examined by Dr. Saleem on May 13, 2010, who noted that Plaintiff had a "huge healing laceration with some intact suture mildly tender Has good range of motion Small area of arm is numb around the scar otherwise neuro exam is negative. [sic]"  *Id*., p. 69.  Saleem's notes indicate the wound was dressed and Plaintiff was to return the following week for follow up regarding the wound.  *Id*.  On May 15, 2010, Plaintiff was evaluated by Physician's Assistant Shana Subram concerning his complaint that he did not receive his pain medication.  She indicated she would write for renewal of the pain medication.  *Id*., p. 73.  She also noted that Plaintiff's laceration was healing and clean and that "suture removal done and there is a well healed scar seen, no swelling, no drainage."  *Id*.

Plaintiff was seen by medical staff on June 25, 2010, June 26, 2010, June 29, 2010, August 6, 2010, October 5, 2010, October 27, 2010, January 3, 2011, February 8, 2011, February 11, 2011, and March 27, 2011 for regular medical care in order to manage his diabetic condition as well as due to specific complaints and requests of plaintiff regarding his diabetic management,

---

[4] Plaintiff refused to have his dressing changed on May 6, 2010. *Id*., p. 36.

athlete's foot, common cold, and requesting blood work.  *Id.*, pp. 79, 82, 87, 92, 97, 100, 101,

103, 105.  During this time Plaintiff neither offered any complaints regarding his right forearm

nor requested any treatment for same.[5]  *Id.*

On May 9, 2011, Plaintiff complained of pain at the wound site.  He was referred to a

doctor and examined the following day.  Decreased strength in two of Plaintiff's fingers was

observed and the physician ordered medication for the pain.  *Id.*, pp. 109-112.  Plaintiff was

offered a trial of Elavil or Neurontin for neuropathic pain.  Dr. Chhunchha explained the chronic

nature of neuropathy but noted that Plaintiff "wants results now or wants to see somebody else.

*Id.*, p. 112.

Upon Plaintiff's transfer to NBCI the end of May, 2011, his medicines were continued.

*Id.*, p. 119.  Physician's Assistant Flury noted during his assessment of Plaintiff on May 31, 2011,

Plaintiff's complaint of nerve pain in his arm.  Flury observed the scar was healed and Plaintiff's

grip strength was equal bilaterally.  Plaintiff reported tenderness to palpation of the forearm from

the elbow to hand along the ulnar distribution.  *Id.*, p. 120.  He was prescribed indomethacin for

pain management.  *Id.*  Plaintiff was again seen by Flury on June 7, 2011, due to continued pain in

his forearm.  He reported that indomethacin was ineffective.  Flury noted that Plaintiff was

awaiting evaluation with the physician for pain management.  *Id.*, p. 123.

Plaintiff was examined several times by medical staff regarding his diabetic condition (*Id.*,

pp. 124-136) and seen by a physician on June 21, 2011, due to his complaint of right forearm

pain.  *Id.*, pp. 136.  At that time it was determined that his condition would be monitored and his

medications, including Neurontin, continued.  *Id.* pp. 138-140.  Plaintiff was again assessed on

June 28, 2011, after complaining of tingling without numbness in his arm and lack of pain relief.

---

[5] Plaintiff indicates he did not complain during this time period because he "was in a situation where [he] could buy pain meds or they were brought to [him]!"  ECF No. 77, p. 6.

He was prescribed a topical ointment and instructed to continue with his other medications. *Id*., pp. 142-143. Plaintiff was seen by medical staff in July, 2011 and his medications continued. *Id*., p. 154. Plaintiff declined to attend appointments scheduled on August 3 and 8, 2011. *Id*., pp. 157, 159. On August 19, 2011, Plaintiff refused to consent to scheduled lab work, however his medication was continued and he was referred to a physician for follow-up regarding his neuropathy and reported recent report of sudden decrease in grip strength which Plaintiff indicated had somewhat improved at time of exam. *Id*., pp. 164-166.

Plaintiff reported on September 15, 2011 weakness in his hand and indicated he had been exercising his hand as directed by the Physician's Assistant. He was instructed to continue the exercises. *Id*., p. 170. Plaintiff was next examined by a doctor the following day due to his continuing complaints of numbness in his fingers as well as other unrelated conditions. Decreased range of motion in the right fourth and fifth fingers was observed. His medications were reviewed and continued and a note was made for him to be reevaluated in one month. *Id*. pp. 174-175. Plaintiff was again examined on October 8, 2011, but offered no complaint regarding his forearm. *Id*., p. 180. On October 19 and 21, 2011, Plaintiff refused to appear for lab work and a scheduled provider visit. *Id*., pp. 184, 186.

Plaintiff was evaluated on November 1, 2011. At that time, due to his lack of response to the conservative treatment of his wrist injury, a consultation request was made for physical therapy. *Id*., pp. 190-195. The request was approved on November 8, 2011 (*id*., p. 189) and Plaintiff was evaluated for physical therapy on November 29, 2011. *Id*., p. 204. Plaintiff received therapy and improvement in his level of pain and numbness were noted. *Id*., pp. 207-19. On December 27, 2011, Plaintiff advised that his condition was somewhat improved and the physical therapist noted that he had no complaint of pain that day. *Id*., pp. 217, 219. Plaintiff's

physical therapy continued until January 24, 2012. *Id.*, pp. 223-227. At that time it was noted that Plaintiff had obtained functional grip and had reached the optimum benefit of physical therapy. *Id.*, p. 230.

Plaintiff was evaluated by a physician on February 22, 2012. He offered no complaint regarding his right arm or hand. *Id.*, p. 236, 239. He refused lab work on March 6, 2012. *Id.* P. 22.

On March 13, 2012, Plaintiff was examined to determine the need for additional physical therapy for his hand.[6]  *Id.*, p. 243. Although Plaintiff had other encounters with health care providers he did not complain regarding his right arm again until April 25, 2012, at which time his dosage of Neurontin was increased. *Id.*, pp. 251-252, 256-258.

On May 13, 2012, Plaintiff was examined by a physician who noted Plaintiff's complaint of increased pain but made no changes to his treatment plan. *Id.* p. 261. On June 17, 2012, Plaintiff was examined by CMS's medical providers. Plaintiff expressed concern with receiving Gabapentin which he believed not to be as good as Neurontin. *Id.*, p. 273. Defendant notes that Neurontin is the brand name for gabapentin. ECF No. 66, p. 8. Thereafter, Plaintiff's care was provided by Wexford.

Mere disagreement with a course of treatment does not provide the framework for a federal civil rights complaint. *See Russell v. Sheffer*, 528 F.2d 318 (4th Cir. 1975). "[A]ny negligence or malpractice on the part of . . . doctors in missing [a] diagnosis does not, by itself, support an inference of deliberate indifference." *Johnson v. Quinones* 145 F. 3d 164, 166 (4th

---

[6] As previously noted, at that time the physical therapist recommended an additional physical therapy session. There is no record, however, that a request for physical therapy was ever presented to Wexford for review. ECF No. 51, p. 4, citing ECF No. 41, Ex. 1, Ex. 2, pp. 53-54.

Plaintiff concedes that he received therapy from November 29, 2011 to January 19, 2012 and was referred for additional therapy evaluation in March of 2012 but did not receive same because he was transferred for court appearances. ECF No. 77, p. 6.

Cir. 1998). Without evidence that a doctor linked presence of symptoms with a diagnosis of a serious medical condition, the subjective knowledge required for Eighth Amendment liability is not present. *Id*. at 169 (actions inconsistent with an effort to hide a serious medical condition refute presence of doctor's subjective knowledge).

Plaintiff, the non-moving party, must establish the existence of a genuine issue of material fact by presenting evidence on which a fact-finder could reasonably find in his favor. Plaintiff has failed to submit any evidence to support his claim that CMS' employees provided constitutionally inadequate medical care. The record demonstrates that, although Plaintiff's discharge instructions directed he return to the hospital clinic for follow-up care, follow-up care was provided adequately by on-site medical providers throughout the Division of Corrections. Plaintiff's complaints regarding his wrist pain were not ignored by employees of CMS. To the contrary, Plaintiff was evaluated, had his sutures removed, provided home exercises, physical therapy, and analgesic pain medication. Medical providers made sincere efforts to address his medical needs and provide appropriate treatment.

**Conclusion**

The dispositive motion filed on behalf of CMS will be granted. A separate Order follow.

Date:  January 29, 2015                              _____/s/_____
                                                     DEBORAH K. CHASANOW
                                                     United States District Judge